IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DANIEL T. PAULY, as Personal Representative
of the ESTATE OF SAMUEL PAULY, deceased,
and DANIEL B. PAULY, Individually,

      Plaintiffs,

vs.                                            Civ. No. 12-1311 KG/WPL

STATE OF NEW MEXICO
DEPARTMENT OF PUBLIC SAFETY,
RAY WHITE, MICHAEL MARISCAL, and
KEVIN TRUESDALE,

      Defendants.

MEMORANDUM OPINION AND ORDER

This matter comes before the Court upon Defendant Raymond White's First Motion for Summary Judgment and Memorandum in Support Thereof (Motion for Summary Judgment), filed November 13, 2013.  (Doc. 83).  Defendant Raymond White (Officer White) moves for summary judgment on the 42 U.S.C. § 1983 claim, the New Mexico Tort Claims Act (NMTCA) claim, and on the New Mexico State Constitution claim.  Officer White also raises a qualified immunity defense with respect to the Section 1983 claim.  Plaintiffs filed a response to the Motion for Summary Judgment on December 23, 2013, and Officer White filed a reply on January 24, 2014.  (Docs. 111 and 132).  Having reviewed the Motion for Summary Judgment, the accompanying briefs, and the evidence of record, the Court denies the Motion for Summary Judgment for the following reasons.

A.  *The Second Amended Complaint for Damages for Deprivation of Civil Rights, Wrongful Death and Common Law Torts (Doc. 46)*

This wrongful death lawsuit arises from an incident in which Officer White, a New Mexico State Police Officer, shot and killed Samuel Pauly at the house he shared with his

brother, Plaintiff Daniel B. Pauly (Daniel Pauly).  Daniel Pauly was at the house at the time of

the shooting.  In addition, Defendants Michael Mariscal and Kevin Truesdale, also New Mexico

State Police Officers, were at the brothers' house when the shooting occurred.

 Plaintiffs' lawsuit is based on Section 1983, the NMTCA, and the New Mexico State

Constitution.  In Count One, Plaintiffs bring a Section 1983 claim against Officers White,

Truesdale, and Mariscal for allegedly violating Samuel Pauly's Fourth Amendment right to be

free from excessive force.[1]  In Count Three, Plaintiffs bring an NMTCA battery claim against

Officers White, Truesdale, and Mariscal, and a corresponding NMTCA *respondeat superior*

claim against Defendant State of New Mexico Department of Public Safety (NMDPS).  In Count

Four, Plaintiffs contend that the NMDPS violated article II, section 10 of the New Mexico State

Constitution through Officers White, Truesdale, and Mariscal's alleged unreasonable seizure of

Samuel Pauly.  Finally, Plaintiffs bring a loss of consortium claim in Count Five.

B.  *Summary Judgment Standard of Review*

 Summary judgment is appropriate if there is no genuine dispute as to a material fact and

the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).[2] When

applying this standard, the Court examines the factual record and reasonable inferences

therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics*

*Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The moving party

bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 325 (1986). Only then does the burden shift to the non-movant to come

forward with evidence showing that there is a genuine issue of material fact. *Bacchus Indus., Inc.*

---

[1] The parties stipulated to dismissing Count Two.  (Doc. 117).

[2] Rule 56 was amended effective December 1, 2010, but the standard for granting summary
judgment remains unchanged.

*v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant. *Kaul v. Stephan*, 83 F.3d 1208, 1212 (10th Cir.1996) (citation omitted). The non-moving party may not avoid summary judgment by resting upon the mere allegations or denials of his or her pleadings. *Bacchus Indus., Inc.*, 939 F.2d at 891.

Summary judgment motions involving a qualified immunity defense are determined somewhat differently than other summary judgment motions. *See Romero v. Fay*, 45 F.3d 1472, 1475 (10th Cir. 1995). "When a defendant raises the qualified immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-part test." *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000). This is a heavy burden for the plaintiff. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (citing *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995)). First, the plaintiff must demonstrate that the defendant's actions violated a constitutional or statutory right. Second, the plaintiff must show that the "right was clearly established such that a reasonable person in the defendant's position would have known that his conduct violated that right." *Maestas v. Lujan*, 351 F.3d 1001, 1007 (10th Cir. 2003). The Tenth Circuit Court of Appeals instructs that

> [i]f the plaintiff does not satisfy either portion of the two-pronged test, the Court must grant the defendant qualified immunity. If the plaintiff indeed demonstrates that the official violated a clearly established constitutional or statutory right, then the burden shifts back to the defendant, who must prove that "no genuine issues of material fact" exist and that the defendant "is entitled to judgment as a matter of law." In the end, therefore, the defendant still bears the normal summary judgment burden of showing that no material facts remain in dispute that would defeat the qualified immunity defense. When the record shows an unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be "properly denied."

*Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) (citations omitted).

C.  *Material Facts and Reasonable Inferences Viewed in the Light Most Favorable to Plaintiffs*

In determining the material facts and reasonable inferences to be viewed in the light most favorable to Plaintiffs, the Court reviewed Officer White's Statement of Undisputed Material Facts, Plaintiffs' Additional Statement of Material Facts, the parties' responses to the statements of undisputed material facts, and the evidence of record.  Unless otherwise noted, the following recitation of material facts and reasonable references reflects the Plaintiffs' version of the facts as gleaned from the evidence of record and excludes facts, contested or otherwise, which are not properly before this Court in this Motion for Summary Judgment.

On the evening of October 4, 2011, Daniel Pauly and two females became involved in a road rage incident on the interstate highway going north from Santa Fe, New Mexico towards Las Vegas, New Mexico.  (Doc. 82-1) at 6 (depo. at 121).   One of the females called 911 and reported a "drunk driver" who was "swerving all crazy" and turning his lights off and on.  (Doc. 82-1) at 23.  After Daniel Pauly passed the females, they apparently tailgated Daniel Pauly. (Doc. 82-1) at 5 (depo. at 117-120).

Daniel Pauly, therefore, stopped at the Glorieta off-ramp as did the females who were following him.  (Doc. 82-1) at 9 (depo. at 133).  Daniel Pauly asked the females why they were following him and why they had the car's brights on.  *Id.*  One of the females reported that Daniel Pauly was "throwing up gang signs" during this encounter.  (Doc. 82-1) at 24.  Daniel Pauly, however, felt personally threatened by the females' driving behavior.  (Doc. 82-1) at 9 (depo. at 134).  Daniel Pauly then drove a short distance from the off-ramp to his house where

his brother, Samuel Pauly, was playing a video game on the couch.[3]  (Doc. 82-1) at 10 (depo. at 145).  The house is located in a wooded rural area to the rear of another house on a hill.  (Doc. 82-1) at 21.

The New Mexico State Police dispatcher contacted Officer Truesdale between 9:00 p.m. and 10:00 p.m. that night regarding the 911 call from the females.  (Doc. 82-3) at 3.  Officer Truesdale arrived at the Glorieta off-ramp to speak to the two females after Daniel Pauly had driven to his house.  *See id*.  Officers White and Mariscal were *en route* to provide Officer Truesdale with back-up assistance.  *Id*.  The females informed Officer Truesdale about Daniel Pauly's alleged reckless and dangerous driving.  *Id*.  The females also described Daniel Pauly's vehicle as a gray Toyota pickup truck and gave dispatch a license plate number.  *Id*.  The dispatcher informed Officer Truesdale that the Toyota pickup truck was registered to an address on Firehouse Road, Glorieta, New Mexico.  *Id*.

Once the two females went on their way, any threat to the females was over.  (Doc. 82-2) at 5 (depo. at 208).  Officers Mariscal and White subsequently joined Officer Truesdale at the Glorieta off-ramp.  Although it was raining, the Officers were not wearing raincoats over their uniforms.  (Doc. 82-1) at 13 (depo. at 179); (Doc. 84-3) at 4 (depo. at 134).   It was also a dark night.[4]  (Doc. 82-3) at 17 (depo. at 100).

---

[3] Defendants note that Samuel Pauly had smoked marijuana and drank half a beer that evening. (Doc. 87-1) at 2 (depo. at 101); (Doc. 87-1) at 5 (depo. at 148).  Defendants also note that Daniel Pauly drank two beers at a club in Albuquerque and drank half a beer at the house.  (Doc. 87-1) at 5-6 (depo. at 148-49).  The Court will not consider this evidence in deciding the Motion for Summary Judgment because it is irrelevant to the issues now before the Court.

[4] Officers White and Truesdale dispute this fact and claim that despite the rain the moon was out and they could see fairly well in the dark.  (Doc. 84-2) at 5 (depo. at 117); (Doc. 85-2) at 4 (depo. at 227).  Officers White and Truesdale do not describe how full the moon was that night.

Officer Truesdale decided to speak with Daniel Pauly to determine if he was intoxicated, "to make sure nothing else happened," and to get Daniel Pauly's version of the incident.  (Doc. 82-2) at 6 (depo. at 218).  At that point, the Officers did not believe any exigent circumstances existed.  *Id*. at 7 (depo. at 213); (Doc. 82-4) at 9-10 (depo. at 20-21).   The Officers also did not have enough evidence or probable cause to make an arrest.  (Doc. 82-3) at 5); (Doc. 82-3) at 14 (depo. at 91).

The Officers then determined that Officers Truesdale and Mariscal should go, in separate patrol units, to see if they could locate Daniel Pauly's pickup truck at the Firehouse Road address while Officer White should stay at the off-ramp in case Daniel Pauly came back that way.  (Doc. 82-3) at 14 (depo. at 92).  Officers Truesdale and Mariscal drove a short distance to the Firehouse Road address and parked their vehicles in front of the main house along the road.  *See* (Doc. 82-4) at 11 (depo. at 109).  The vehicles had their headlights on and one vehicle had takedown lights on; none of the vehicles had flashing lights on.  (Doc. 82-4) at 11 (depo. at 109-10).   Officers Truesdale and Mariscal did not see Daniel Pauly's pickup truck at the main house.  *See* (Doc. 82-2) at 9 (depo. at 230).

Officers Truesdale and Mariscal, however, saw a porch light and lights on in another house behind the main house, so they decided to walk up to that second house, Daniel and Samuel Pauly's house, to see if Daniel Pauly's pickup truck was there.  (Doc. 82-2) at 9 (depo. at 232); (Doc. 82-3) at 6.  The Officers did not activate any security lights as they walked up to the brothers' house.  (Doc. 82-3) at 18 (depo. at 115).

Officers Truesdale and Mariscal approached the brothers' house in such a way that the brothers did not know that the Officers were there.  (Doc. 82-2) at 12 (depo. at 224).  The Officers chose this kind of approach in an attempt to maintain officer safety.  *Id*. at 14 (depo. at

6

233).  Officers Truesdale and Mariscal, therefore, did not initially use their flashlights and then used the flashlights periodically.  *Id*. at 13 (depo. at 226); (Doc. 82-3) at 15 (depo. at 101).   After Officer Truesdale got close to the front of the house and began approaching the front door, he turned his flashlight on.  (Doc. 85-3) at 3 (depo. at 249-50, 252).  The Officers could see through the front window two males moving back and forth in the house.  (Doc. 88-3) at 1 (depo. at 152).  As the Officers got closer to the second house, they also saw Daniel Pauly's pickup truck and advised Officer White that they located the pickup truck.  (Doc. 82-5) at 12.  Officer White then proceeded to the Firehouse Road address.  *Id.*

At around 11:00 p.m., the brothers saw through the front window two blue LED flashlights, five or seven feet apart at chest level, coming towards the house.  (Doc. 82-1) at 11 (depo. at 170-71); (Doc. 82-3) at 4.  Daniel Pauly could not see who held the flashlights, especially with the rain coming in sideways.  (Doc. 82-1) at 11 (depo. at 171); (Doc. 87-2) at 3 (depo. at 208).  Daniel Pauly thought the figures were intruders possibly related to the road rage incident; it did not enter Daniel Pauly's mind that the figures could have been police officers. (Doc. 82-1) at 11-12 (depo. at 171, 173); (Doc. 87-2) at 4 (depo. at 220).  Both brothers then yelled out several times, "Who are you?" and, "What do you want?"  (Doc. 82-1) at 13 (depo. at 179-80).  In response to those inquiries, the brothers heard a laugh and, "Hey, (expletive), we got you surrounded.  Come out or we're coming in."[5]  *Id*. at 13 (depo. at 180).  Moreover, Officer Truesdale yelled out once, "Open the door, State Police, open the door." (Doc. 87-2) at 2 (depo. at 185-86); Truesdale Coban recording, Supp. #19.  Daniel Pauly, however, did not hear anyone

---

[5] The Officers did not actually intend to go inside; they were trying to get the brothers to come out of the house.  (Doc. 82-4) at 2 (depo. at 162).

call out "State Police" until after Officer White shot Samuel Pauly. [6]  (Doc. 82-1) at 14 (depo. at 181).  Officer Mariscal also announced, "Open the door, open the door."  (Doc. 82-3) at 5.

Daniel Pauly felt scared and that his life, his brother's life, and the lives of their dogs were being threatened by unknown people outside the house.  (Doc. 82-1) at 16 (depo. at 205); (Doc. 82-1) at 17 (depo. at 222).  The brothers then decided to call the police.  (Doc. 82-1) at 17 (depo. at 222).  Before they could do so, Daniel Pauly heard, "We're coming in. We're coming in." *Id*.

At that point, Samuel Pauly retrieved a shotgun and a box of shells for Daniel Pauly so that the brothers could get ready for a home invasion.  *Id*. at 17 (depo. at 222-23).  Samuel Pauly also obtained a loaded handgun.  (Doc. 82-3) at 4.  Daniel Pauly then stated to Samuel Pauly that he was going to fire a couple of warning shots.  (Doc. 82-1) at 17 (depo. at 223).  Samuel Pauly went back to the front room.  *Id*.  Next, one of the brothers yelled out from inside of the house, "We have guns."  (Doc. 85-4) at 2 (depo. 276).  Officers Mariscal and Truesdale subsequently saw someone, presumably Daniel Pauly, run towards the back of the house.  (Doc. 82-2) at 23 (depo. at 272).  Officer Truesdale, therefore, went to the far back corner of the house to see what was happening on the other side of the house.  *Id*. at 21 (depo. at 274).  Officer Truesdale then stated, "Open the door, come outside."  (Doc. 82-3) at 5.

---

[6] The Officers dispute that Daniel Pauly did not know that State Police Officers were outside the house prior to Officer White shooting Samuel Pauly.  The Officers claim that they shouted out "State Police" numerous times throughout the incident.  *See, e.g.,* (Doc. 82-3) at 5-8.  Officer Mariscal also claims that that he illuminated himself with a flashlight and that "the individuals" in the house shined flashlights in the direction of himself and Officer Truesdale.  *Id*. at 7-8.  However, Officer Truesdale, Officer White, and Daniel Pauly did not testify to seeing Officer Mariscal shine a flashlight on himself nor did Daniel Pauly testify to using a flashlight .  *See* (Doc. 84-3) at 2 (depo. at 127).

While Officers Truesdale and Mariscal were trying to get the brothers to come out of the house and before one of the brothers yelled out, "We have guns," Officer White arrived at the Firehouse Road address and walked up towards the brothers' house, using his flashlight periodically.  *Id.*; (Doc. 84-2) at 4 (depo. at 116).  Officer White could also see two males walking in the front living room.  (Doc. 82-4) at 12 (depo. at 123).  In addition, Officer White heard a male from inside of the house say, "We have guns."  (Doc. 82-3) at 6. When Officer White reached the front of the house, Officer Mariscal was still in the front of the house while Officer Truesdale was already at the rear of the brothers' house.  (Doc. 82-3) at 5.

After hearing, "We have guns," Officer White took cover behind a stone wall located 50 feet from the front of the house and drew his duty weapon while Officer Mariscal took cover behind a Ford pickup truck and unholstered his duty weapon.  (Doc. 82-4) at 13 (depo. at 132); (Doc. 84-3) at 4 (depo. at 135); (Doc. 84-5) at 3 (depo. at 191); (Doc. 88-3) at 5 (depo. at 173-74).  A matter of seconds after one of the brothers yelled, "We have guns," Daniel Pauly stepped partially out of the back of the house and fired two warning shots up into a tree while screaming to scare people off.  (Doc. 82-1) at 17 (depo. at 224); (Doc. 82-1) at 19 (depo. at 226); (Doc. 84-5) at 6 (depo. at 209).  Daniel Pauly did not feel comfortable going out the front door after he initially heard someone say that the brothers were surrounded and "come out or we're coming in."  (Doc. 82-1) at 18 (depo. at 204).  Having heard the two rifle shots, Officer White believed that Officer Truesdale had been shot.[7]  (Doc. 84-3) at 5 (depo. at 137).

_____

[7] Officer White claims that after he heard the first two shotgun blasts he yelled out, "State Police, hands up, hands up, hands up."  (Doc. 82-5) at 13.  Officer Mariscal's audio recording of the gunfire, however, does not include this statement.  DVD: Mariscal, NMSP.

Officers Mariscal and White then saw Samuel Pauly open the front window and hold his arm out with a handgun, pointing it at Officer White.[8]   (Doc. 82-4) at 3 (depo. at 185); (Doc. 82-4) at 4 (depo. at 190-91); (Doc. 82-4) at 14 (depo. at 171); (Doc. 88-4) at 3 (depo. at 193). Officer Mariscal then shot towards Samuel Pauly, but missed Samuel Pauly.[9]   Four to five seconds after Samuel Pauly pointed his handgun at Officer White, Officer White shot Samuel Pauly.  (Doc. 84-5) at 3 (depo. at 191).  The entire incident, from the time Officers Truesdale and Mariscal arrived at the Firehouse Road address to the time of the shootings, took less than five minutes.  (Doc. 113) at 28.

*D.  Discussion*

Officer White argues that he is entitled to summary judgment on the Fourth Amendment excessive force claim because his use of force on Samuel Pauly was objectively reasonable under the totality of the circumstances.  Officer White also argues that he is entitled to qualified immunity on the Fourth Amendment excessive force claim.  Next, Officer White argues that the undisputed facts show that he did not violate Samuel Pauly's rights under article II, section 10 of

---

[8] Officers Mariscal and White assert that not only did Samuel Pauly point the handgun at Officer White, but that Samuel Pauly actually fired the handgun.  (Doc. 82-4) at 4 (depo. at 190-91); (Doc. 82-4) at 14 (depo. at 171-72).  A revolver later found on the living room floor under the front window where Samuel Pauly was shot had one casing forward of the firing pin while the other four chambers were loaded.  (Doc. 82-5) at 21.  No bullet casing was recovered from the handgun, so there is no forensic proof that Samuel Pauly fired the handgun that night.  *See id.* at 20.  However, from Officer Truesdale's position, "[t]he first two shots were louder than the third, and the third shot was quieter then [sic] the fourth" indicating that the third shot came from the house, i.e., that Samuel Pauly fired that third shot.  *Id.* at 17.

[9] Officer Mariscal strongly believes that he fired a shot at Samuel Pauly after Samuel Pauly fired the handgun.  (Doc. 82-4) at 6 (depo. at 210-211); (Doc. 82-5) at 15; (Doc. 88-4) at 3 (depo. at 195).  Officer Mariscal normally carries a total of 16 cartridges in his duty weapon.  (Doc. 82-4) at 5 (depo. at 130-31).   After the shooting, Officer Mariscal was missing one cartridge from his magazine.  (Doc. 82-5) at 19.  Moreover, since only four shots were fired that night, if Officer Mariscal fired the third shot as he claims and Office White fired the fourth shot, then Samuel Pauly could not have fired upon Officer White.

the New Mexico State Constitution nor did he commit a battery on Samuel Pauly.  Finally,

Officer White argues that the NMDPS cannot be held vicariously liable for the alleged battery he

committed or for his alleged violation of the New Mexico State Constitution.  Plaintiffs contend

that these arguments have no merit.

    *1.  Count One:  the Section 1983 Fourth Amendment Excessive Force Claim*

        *a. Whether Officer White is Entitled to Summary Judgment on Count One*

    Officer White argues first that he is entitled to summary judgment on Count One because

the undisputed material facts show that his use of deadly force on Samuel Pauly was objectively

reasonable under the totality of the circumstances and, therefore, lawful under the Fourth

Amendment.  Plaintiffs argue, however, that there are genuine disputes of material fact and that

when the facts are viewed in the light most favorable to Plaintiffs a reasonable jury could find

that the Officers' conduct was reckless and unreasonably created the need for Officer White to

shoot Samuel Pauly.  Plaintiffs, therefore, assert that a reasonable jury could find that Officer

White's objectively unreasonable use of deadly force violated Samuel Pauly's Fourth

Amendment right to be free from excessive force.  Thus, Plaintiffs contend that Officer White is

not entitled to summary judgment on Count One.[10]

    The issue in Fourth Amendment excessive force cases is whether, under the totality of the

circumstances, an officer's use of force was objectively reasonable.  *Thomson v. Salt Lake

County*, 584 F.3d 1304, 1313 (10th Cir. 2009).  Reasonableness of the use of force is judged

from the viewpoint of a reasonable officer at the scene of the incident and not from hindsight.

*Id*.  As always, courts "recognize that officer may have 'to make split-second judgments in

---

[10] Plaintiffs note that Officer White does not address their Fourth Amendment claim based on
Officer White's alleged unreasonable seizure of Samuel Pauly prior to his shooting death.  The
Court, however, has determined that Plaintiffs have not pled a Fourth Amendment unreasonable
seizure claim.  *See* (Doc. 123).

uncertain and dangerous circumstances.'"  *Id.* (quoting *Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2004) (internal quotation marks omitted)).

If a use of force is deadly, as in this case, that force is reasonable "only 'if a reasonable officer in Defendant's position would have had probable cause to believe that there was a *threat of serious harm to themselves* or to others.'"  *Id.* (quoting *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008)).  To assess the degree of that threat of serious physical harm, the Court considers "factors that include, but are not limited to:  '(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.'"  *Id*. at 1314-1315 (quoting *Estate of Larsen*, 511 F.3d at 1260).  Another important factor is "'whether the officers were in danger at the precise moment that they used force.'"  *Id.* at 1314 (quoting *Phillips v. James*, 422 F.3d 1075, 1083 (10th Cir. 2005) (internal quotation marks omitted)).  Moreover, the "'reasonableness standard does not require that officers use alternative, less intrusive means' when confronted with a threat of serious bodily injury."  *Blossom v. Yarbrough*, 429 F.3d 963, 968 (10th Cir. 2005) (quoting *Cram*, 252 F.3d at 1133) (internal quotations omitted)).  Whether the events leading up to the use of deadly force were "tense, uncertain, and rapidly evolving" is also "extremely relevant" to the totality of the circumstances review.  *Thomson*, 584 F.3d at 1318 (quoting *Phillips*, 422 F.3d at 1083-84) (internal quotation marks omitted).  Additionally, "a reasonable but mistaken belief that the suspect is likely to fight back justifies using more force than is actually needed."  *Id*. at 1315.

Reasonableness of an officer's use of deadly force further depends on "whether their 'own reckless or deliberate conduct during the seizure unreasonably created the need to use such

force.'  The conduct of the officers before a suspect threatens force is relevant only if it is

'immediately connected' to the threat of force."  *Id*. at 1320 (citations omitted).   Moreover, an

officer's conduct prior to a suspect threatening force "is only actionable if it rises to the level of

recklessness" or deliberateness, i.e., the officer's actions cannot constitute mere negligence.  *Id*.

"An act is reckless when it reflects a wanton or obdurate disregard or complete indifference to

risk, for example 'when the actor does not care whether the other person lives or dies, despite

knowing that there is a significant risk of death' or grievous bodily injury."  *Medina v. City and*

*County of Denver*, 960 F.2d 1493, 1496 (10th Cir. 1992), *overruled on other grounds by Morris*

*v. Noe,* 672 F.3d 1185, 1197 n. 5 (10th Cir. 2012) and *Williams v. City & County of Denver,* 99

F.3d 1009, 1014–1015 (10th Cir.1996).  In addition, if it was feasible for the officer to warn a

suspect not to use force, the failure to issue such a warning could create an unreasonable need to

use deadly force.  *See Thomson*, 584 F.3d at 1321.  Determining whether an officer's reckless or

deliberate conduct unreasonably created a need to use force "is simply a specific application of

the totality of the circumstances approach inherent in the Fourth Amendment's reasonableness

standard."  *Id.* at 1320 (internal quotation marks omitted) (citing *Cram*, 252 F.3d at 1132).

        In this case, the Plaintiffs do not argue that Samuel Pauly did not make hostile motions

with his weapon or that the events leading up to Officer White shooting Samuel Pauly were not

"tense, uncertain, and rapidly evolving."  Instead, Plaintiffs contend that the reckless or

deliberate conduct of the Officers unreasonably created a need for Officer White to shoot Samuel

Pauly.  In fact, the record contains genuine disputes of material fact regarding whether the

Officers' conduct prior to the shooting of Samuel Pauly was at the very least reckless and

unreasonably precipitated Officer White's need to shoot Samuel Pauly.  For example, it is

disputed whether (1) the Officers adequately identified themselves, either verbally or by using a

flashlight; (2) the brothers could, nonetheless, see the Officers considering the ambient light and other light sources; and (3) it was feasible for Officer White to warn Samuel Pauly before shooting him.

Furthermore, viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find the following: there were no exigent circumstances requiring the Officers to go to Daniel Pauly's house at 11:00 p.m.; Officers Truesdale and Mariscal purposefully approached the house in a surreptitious manner; despite the porch light and light from the house, the rain and darkness made it difficult for the brothers to see who was outside their house; the fact that the brothers' house is located in a rural wooded area would have heightened the brothers' concern about intruders; the Officers provided inadequate police identification by yelling out "State Police" once; the Officers' use of a hostile tone in stating, "we got you surrounded. Come out or we're coming in" was threatening; statements by Officers Truesdale and Mariscal of "open the door" and other statements of "we're coming in" were, likewise, threatening; it would have been reasonable for the Officers to conclude that Daniel Pauly could believe that persons coming up to his house at 11:00 p.m. were connected to the road rage incident which had occurred a couple of hours previously; that under these circumstances, the occupants of the house would feel a need to defend themselves and their property with the possible use of firearms; and the incident occurred in less than five minutes. A reasonable jury could then find that under the totality of the above circumstances that (1) the Officers' conduct was "immediately connected" to Samuel Pauly arming himself and pointing a handgun at Officer White; and (2) the Officers' conduct reflected "wanton or obdurate disregard or complete indifference" to the risk of an occupant of the house being subject to deadly force in the course of protecting his house and property against threatening and unknown persons. A reasonable jury could, therefore, find that the Officers'

reckless conduct unreasonably created the dangerous situation leading to Officer White's need to shoot Samuel Pauly.  Consequently, a reasonable jury could find that Officer White's use of deadly force on Samuel Pauly was not objectively reasonable and violated the Fourth Amendment.  Clearly, there are genuine issues of material fact which foreclose the Court from granting summary judgment on Count One.

### b. Qualified Immunity

Officer White also argues that he is entitled to qualified immunity on Count One.  To resolve the first part of the qualified immunity test, the Court must decide if the alleged facts, when viewed "in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a constitutional right[.]"  *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (citation omitted).  As shown above, Plaintiffs have produced sufficient evidence to show that Officer White violated Samuel Pauly's Fourth Amendment right to be free from excessive force.  Hence, Plaintiffs meet the first step in defeating qualified immunity.

To resolve the second part of the qualified immunity test, Plaintiffs must demonstrate that Samuel Pauly's Fourth Amendment right to be free from excessive force was clearly established at the time of the shooting.  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the right [was] sufficiently clear that a reasonable officer would understand that what he is doing violates that right.'"  *Cram*, 252 F.3d at 1128 (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).  "[I]n order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992).  A plaintiff, however, "is not required to show

that the very conduct in question has previously been held unlawful." *Sh. A. ex rel. J. A. v. Tucumcari Mun. Schools*, 321 F.3d 1285, 1287 (10th Cir. 2003).

Since 1997, it has been clearly established in the Tenth Circuit "that an officer is responsible for his or her reckless conduct that precipitates the need to use force." *Murphy v. Bitsoih*, 320 F.Supp.2d 1174, 1193 (D.N.M. 2004) (citing *Allen v. Muskogee*, 119 F.3d 837, 841 (10th Cir. 1997)).  Accepting Plaintiffs' version of the facts, a reasonable person in Officer White's position would have understood that the reckless actions of the Officers, including his own reckless actions, unreasonably precipitated his need to shoot Samuel Pauly and, therefore, violated Samuel Pauly's Fourth Amendment right to be free from excessive force.  Hence, Plaintiffs meet the second step in defeating qualified immunity.

Having met the test to defeat qualified immunity, the burden shifts back to Officer White to prove that there is no genuine issue of material fact that would defeat the qualified immunity defense.  As discussed above, various genuine issues of material fact exist which concern whether the Officers' conduct prior to the shooting of Samuel Pauly was reckless and unreasonably created Officer White's need to shoot Samuel Pauly.  Moreover, viewing the facts in the light most favorable to Plaintiffs, a reasonable jury could determine that the actions of the Officers were reckless and that those actions unreasonably precipitated the need for Officer White to shoot Samuel Pauly.  Having failed to carry his burden of proving that there are no genuine issues of material fact that would defeat his claim for qualified immunity, Officer White cannot claim that qualified immunity entitles him to summary judgment on Count One.

2. *Count Four: the New Mexico State Constitution Claim*[11]

Next, Officer White argues that he is entitled to summary judgment on the New Mexico State Constitution claim because the undisputed material facts show that his use of force on Samuel Pauly was objectively reasonable under the totality of the circumstances. Count Four, however, does not state an excessive force claim under the New Mexico State Constitution. Rather, Count Four states a New Mexico State Constitution claim for unreasonable seizure. Consequently, the Court cannot grant summary judgment on Count Four. *See Elliott Industries Ltd. Partnership v. BP America Production Co.*, 407 F.3d 1091, 1121 (10th Cir. 2005) ("Obviously, under Rule 56(a) a party cannot move for summary judgment on a nonexistent, non-pleaded claim.").

3. *Count Three: the NMTCA Battery Claim*

Officer White argues that he is entitled to summary judgment on the NMTCA battery claim because the undisputed material facts demonstrate that his use of force was reasonably necessary. In New Mexico, an officer "is entitled to use such force as was reasonably necessary under all the circumstances of the case." *Mead v. O'Connor*, 1959-NMSC-077 ¶ 4, 66 N.M. 170. Accordingly, a battery claim exists only if the officer used unlawful or unreasonable force. *Reynaga v. County of Bernalillo*, 1995 WL 503973 *2 (10th Cir.). Since there are genuine questions of material fact pertaining to whether Officer White used objectively reasonable force under the totality of the circumstances, the Court cannot grant summary judgment on Count Three.

---

[11] The Court will discuss Count Four before addressing Count Three because that is the order in which Officer White discusses those Counts in the Motion for Summary Judgment.

*4. NMDPS Liability Pursuant to the Doctrine of Respondeat Superior*

Lastly, Officer White argues that since he is entitled to summary judgment on Counts Three and Four, the NMDPS cannot be vicariously liable under the doctrine of *respondeat superior* for his alleged actions in Counts Three and Four.  Having already determined that Officer White is not entitled to summary judgment on Counts Three and Four, the *respondeat superior* claims against the NMDPS are, likewise, not subject to summary judgment.

IT IS ORDERED that Defendant Raymond White's First Motion for Summary Judgment and Memorandum in Support Thereof (Doc. 83) is denied.

UNITED STATES DISTRICT JUDGE